IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CAROLINE HENRICH** | **:** | **CIVIL ACTION** |
| | **:** | |
| | **:** | |
| **v.** | **:** | **NO. 25-4961** |
| | **:** | |
| **COLBY'S CREW RESCUE, et al.** | **:** | |
| | **:** | |

<u>**MEMORANDUM OPINION**</u>

**Henry, J.**                                                                                          **March 26, 2026**

Pending before the Court is Defendants Colby's Crew Rescue ("CCR"), Olivia Fuller, Allison Smith, and Stephanie Seltzer's Motion to Dismiss or Strike the Complaint in this case. *See* ECF No. 2 ("Mot."). Because I find that Plaintiff has not stated a claim for false light invasion of privacy or civil conspiracy, I will grant the Motion in part. The Motion to Strike is denied as moot. I decline to award Defendants their attorneys' fees and costs.

## I.    Procedural History

Plaintiff Caroline Henrich initially brought this case in the Pennsylvania Court of Common Pleas in Berks County, bringing claims for false light invasion of privacy against Defendants CCR, Fuller, Smith, and Stephanie Seltzer and civil conspiracy against CCR and Seltzer. Plaintiff alleged that, following her filing of a lawsuit in Virginia against Defendants CCR, Fuller, and Smith concerning a breach of contract, those same Defendants made a Facebook post (the "Post") discussing the Virginia lawsuit and its preceding circumstances that placed Plaintiff in a false light. She also alleged that Seltzer commented on the Post in a manner placing Plaintiff in a false light. She finally alleged that Seltzer conspired with CCR by providing it with a Discord text message that was included as part of the Post.

1

The Defendants removed the case to this Court on August 29, 2025, arguing that this Court has diversity jurisdiction because the only Defendant defeating diversity, Seltzer, was fraudulently joined. *See* ECF No. 1 at 7-8. The same day they removed this case, Defendants filed the present Motion to Dismiss. On September 8, 2025, Plaintiff filed an uncontested Motion to Extend Time to Respond to the Motion to Dismiss (ECF No. 6), as she intended to file a Motion to Remand and sought leave to wait to respond to the Motion to Dismiss until after the Court decided her Motion to Remand. The Court granted the uncontested Motion to Extend, *see* ECF No. 7, and Plaintiff filed her Motion to Remand on September 29, 2025, *see* ECF No. 9.

On February 13, 2026, the Court denied Plaintiff's Motion to Remand, finding that Defendant Seltzer was fraudulently joined and, therefore, the Court had diversity jurisdiction over the case. *See* ECF No. 17. Seltzer was accordingly dismissed from the case, and the Court ordered Plaintiff to file her Response to the Motion to Dismiss. Plaintiff filed her Response in Opposition to the Motion to Dismiss on February 20, 2026, *see* ECF No. 18 ("Opp."), and Defendants filed their Reply brief on March 6, 2026, *see* ECF No. 19. The Motion is now ripe for disposition.

## II.    Factual Allegations

The relevant facts, which I must accept as true for the purpose of a Motion to Dismiss, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), are as follows:

CCR is a 501(c)(3) organization that saves horses from going to slaughter in Pennsylvania. *See* ECF No. 1-2 ("Compl.") at ¶ 21. Fuller and Smith are CCR's co-founders; Smith is its President and Executive Director and Fuller is a past officer who is now responsible for marketing. *Id.* at ¶ 22. CCR raises money by conducting live Facebook, Instagram, and TikTok fundraisers at a livestock facility and via posts on their Facebook and Instagram accounts. *Id.* at ¶ 24.

In September 2023, Plaintiff advised CCR that she was interested in adopting a horse, providing information about her relationship with horses and indicating that she planned to

2

complete an application.  *Id.* at ¶ 49.  Smith told Plaintiff that an application was not necessary, and instead, she should send an email to a CCR employee about adoption.  *Id.*  Plaintiff sent an email to a CCR employee, Shannon McGowan, who advised Plaintiff about which type of horse would be a good match for her.  *Id.* at ¶¶ 49-50, Ex. B.  At an unspecified time, but before Defendants made the Post, Plaintiff told Defendant Smith that she had ridden horses before, had haltered and walked horses, and correctly handled a horse who had been spooked.  *Id.* at ¶¶ 61, 65.

In October 2023, during one of CCR's livestreamed fundraisers, Smith walked a horse in front of the camera who had been kicked in the head.  *Id.* at ¶ 26.  Plaintiff told CCR, Fuller, and/or Smith in writing that if this horse, which the Defendants called Circles, but which Plaintiff referred to as Survivor, was adoptable, she would like to adopt him.[1]  *Id.* at ¶¶ 27-28, 51.  Plaintiff also paid CCR what Fuller and/or Smith indicated was Circles's "full bail."  *Id.* at ¶ 51.

Circles was transported to Virginia Equine Rehab in December 2023,[2] where he remained under close medical care from a veterinarian there, Dr. Davis, for the next several months.  *See id.* at ¶¶ 30-31.  Plaintiff received frequent updates on Circles's medical state and visited him almost every weekend from late January 2024 to early June 2024.  *Id.* at ¶ 30.

On December 26, 2023, Plaintiff and Dr. Davis exchanged text messages regarding Circles's care, during which Dr. Davis told Plaintiff that she "[had] far more experience in care than most of [Dr. Davis's] clients" and that she was "fully qualified to look after [Circles.]"  *Id.* at ¶ 63, Ex. I.  Plaintiff told Smith about this conversation at some point prior to Defendants making the Post.  *Id.* at ¶ 65.  Around this time, after being weaned off of medications at the direction of

---

[1] For ease of reference, I will refer to the horse as Circles throughout.

[2] The Complaint states this happened in December 2024, but this must be a typo, as Circles was eventually euthanized in August 2024.

CCR's veterinarian, Marion duPont Scott Equine Medical Center ("EMC"), Circles was found cast[3] at Dr. Davis's facility, suffering nystagmus.[4]  *Id.* at ¶ 74.

On January 1, 2024, Smith and/or Fuller told Plaintiff via text message that they "cannot wait for [Plaintiff] and [Circles] to begin [their] journey together."  *Id.* at ¶ 52, Ex. D.  Smith and/or Fuller, on behalf of CCR, agreed that Plaintiff should have full rights to contact their veterinarian, EMC, and speak with EMC doctors while Circles visited the EMC facility in January 2024.  *Id.* at ¶ 53.  EMC veterinarians copied Plaintiff on key medical reports.  *Id.* at ¶ 54.  An EMC employee permitted Plaintiff to remain in Circles's stall for a significant time alone with him, to which Smith and Fuller did not raise concerns.  *Id.* at ¶ 66.  On February 7, 2024, an EMC doctor emailed Plaintiff, setting forth treatment options and saying that "[t]here [was] also a chance that [Circles] could live with this condition long term with treatment as needed."  *Id.* at ¶ 76, Ex. L.

On April 15, 2024, Plaintiff purchased a different horse and disclosed this purchase to Fuller at an unspecified time.  *Id.* at ¶¶ 62, 65.  A few days later, Fuller and/or Smith texted Plaintiff that they were waiting on final paperwork but "it looks like you will be able to take him soon."  *Id.* at ¶ 57, Ex. E.  Plaintiff proceeded to publicly announce the adoption after receiving that text.  *Id.* at ¶ 58, Ex. F.  A week later, CCR, Smith, and/or Fuller told Plaintiff that they were waiting to hear from Dr. Davis about when she could bring Circles to the EMC facility for a checkup.  *Id.* at ¶ 77.  Then, in May, an unspecified individual asked whether Circles was going to be adopted, and CCR responded to that person that "he does have an adopter lined up."  *Id.* at ¶ 59.

---

[3] "Cast" is a term for a horse being stuck on their side or upside down.  World Horse Welfare, *Collapse and cast in horses*, https://www.worldhorsewelfare.org/advice/collapse-and-cast-in-horses?srsltid=AfmBOopLFHmssRy3--WYysZIazi5nwH37palqX6Y9OX8k77ecXsyhAIE (last visited Mar. 19, 2026).

[4] "Nystagmus" is "rapid, uncontrollable eye movements."  Cleveland Clinic, *Nystagmus*, https://my.clevelandclinic.org/health/diseases/22064-nystagmus (last visited Mar. 19, 2026).

On June 11, 2024, Circles had a medical recheck from EMC. *Id.* at ¶ 84. Dr. Davis told Plaintiff that she considered the recheck to be a formality. *Id.* at ¶ 85, Ex. M. Prior to this, Plaintiff had developed a plan to transfer Circles to a stable she had chosen and which CCR, Smith, and/or Fuller had approved. *Id.* at ¶ 78. The next day, on June 12, Dr. Krista Estell of EMC told Plaintiff that she was happy with how Circles looked. *Id.* at ¶¶ 33, 86, Ex. N. That same day, Fuller told Plaintiff that Circles needed to stay in a rehabilitation facility and that the EMC surgeon did not recommend surgery. *Id.* at ¶¶ 34, 87. In response, on June 14, 2024, Plaintiff forwarded Dr. Estell's email about Circles's condition to Fuller. *Id.* at ¶¶ 35, 89. Plaintiff also asked Dr. Estell for the report on Circles from the June 11 recheck, but she never received it. *Id.* at ¶¶ 36, 88. After receiving Plaintiff's forwarded email from Dr. Estell, Fuller called Plaintiff and offered a two-month lease arrangement, after which Plaintiff, Fuller, and Smith would jointly announce that Circles had been euthanized. *Id.* at ¶¶ 37, 91. Fuller told Plaintiff she could adopt another horse for no charge following this. *Id.* Plaintiff refused the offer, stating instead that she had satisfied all conditions precedent to adopt Circles. *Id.* at ¶¶ 38, 91.

Plaintiff engaged counsel and in July 2024 filed a Petition for Declaratory Judgment and Injunctive Relief and a Motion for Temporary Injunction in Virginia state court to prevent CCR, Fuller, and Smith from euthanizing Circles. *Id.* at ¶¶ 39-40. The Virginia court denied the Motion for Temporary Injunction in July 2024. *Id.* at ¶ 45.

On August 2, 2024, CCR, Smith, and/or Fuller posted to Facebook the following Post:

CIRCLES UPDATE

We are sorry it's been so long since we've posted.

Circles came up a lot in the live feed numerous times this week and our donors deserve an update.

They also deserve the true transparent truth, not fairytales.

Colby's Crew is committed to transparency.

5

As many of you know, we rescued a horse named Circles from slaughter in October of last year. He is battling four separate neurological conditions — TBI, EPM, a luxating dens that causes full blown seizures, and his latest diagnosis from June includes damage to his brain.

When we last posted about him on social media, we left off deciding whether or not to do surgery to correct his dens, which was somewhat controlled by steroids— but as we are constantly reminded by our veterinarians, a horse can't remain on steroids forever. He is a terminal patient.

We explained to his potential adopter and benefactor that he would need to be cleared by his veterinarians before we could start the adoption process. She acknowledged that not only to us, but also publicly to our following on our social media.

Circles had that appointment in mid-June, and we explained to his veterinarians that he had a potential adopter. We told them what she wanted to do, and what type of handlers he would have. This potential adopter also emailed them her plan for adoption, and directly asked them to recommend Colby's Crew allow her to adopt Circles.

Unfortunately, upon recheck, Circles was not a candidate for surgery as we had hoped, and he would need to remain inside a veterinarian-run rehabilitation facility for the rest of his life. His medical plan went from having a potential cure to hospice care and management. This changed things.

The potential adopter's plan included moving him to a boarding facility specializing in retirees, but it is not a rehabilitation center.

Circles, when circled rapidly during dynamic exam, developed spontaneous horizontal nystagmus. He is a grade 3/5 base wide ataxia at baseline following treatment. He is not steady on his feet and his current veterinarian reports he has 'good days and bad days,' and some days he cannot leave his stall at all.

For his safety, and the safety of those around him, his vets ruled he would need to stay in a facility with 24/7 monitoring, experienced handlers who have dealt with severe neurological conditions, and, if his condition were to worsen, that he be humanely euthanized to prevent further suffering.

His potential adopter and her plan were not fit to meet those conditions, as she had never owned a horse before and was not an experienced handler, and the facility she intended to move him to could not provide the round-the-clock monitoring and veterinary services Circles' needs.

But, she had recently fractured her ankle, so we tabled the discussion for a later date to see if we could find a suitable rehabilitation center near her.

The adoption process was never officially started.  We never even got through the first step—she didn't fill out our Adoption Application.  Per the screen shots below, she openly admitted she does not have an adoption contract or any mutually signed paperwork.

She did, however, continue to donate to various horses needing rescue.  Naming them and also passing on her ability to name to followers in the discord and in the regular Facebook chat.  Not all of her contributions were earmarked for Circles, in fact the majority were not.

Recently, we received a legal complaint stating this person believed she was Circles' 'adoptive parent' and requesting that he be moved immediately to a public boarding stable, which did not provide veterinary or rehabilitative care, and who may or may not be aware that if Circles turns his head suddenly, he could fall over and have a seizure on top of his handler.  See the screenshot from one of his veterinarians.

This horse presents a life-threatening danger to anyone handling him in his current state.

Before we could answer the complaint, we received notice that she (the potential adopter and now petitioner in a case against us) had filed an emergency injunction to stop Circles from being euthanized for ANY reason.  So, if he was down and seizing in his stall, a vet could not render compassionate euthanasia.

This is not only dangerous to his handlers but also dangerous and inhumane to Circles.  As someone who suffers from seizures myself, I cannot imagine seizing to the point of death while a medical doctor looks on powerless to end my suffering, add 1000lbs [sic] of muscle to the equation and it becomes quite dangerous for all involved.

Due to Circles' severe medical conditions, we could not allow this to stand.  We of course objected to the motion and WON.  The judge ruled that, based on the evidence submitted, the petitioner had 'failed to demonstrate any possessory interest or ownership right to the horse that is the center of the dispute,' and therefore she has no right to try to limit Colby's Crew's decision-making regarding Circles' care, custody, and control.

Right now, Circles is still within a rehabilitation center receiving top quality care and moving him from that location to a standard barn would be detrimental to his health.  Not a single vet is willing to sign off on moving him anywhere other than another experienced rehabilitation center with 24/7 monitoring and access to a veterinarian.  This is not just for Circles' safety but is a matter of public safety.

While we will always be grateful for her generous support and contributions, at no point did we solicit donations directly from this person.  She donated freely of her own will without ever being directly asked or solicited individually.

7

In her legal complaint, she stated she donated to and only for the purpose of caring for Circles.  But based on evidence, that is not true.  She did not specifically/legally directed [sic] her donations solely for Circles' care.  And in any case, serving as benefactor to a rescue horse does not entitle you to ownership of that horse.

We are fighting for Circles in court, and we are fully prepared to continue, not only to protect him from a situation that is not suitable to his needs, but also to ensure he does not endanger the general public around him.  He is safe and well cared for in his current environment, and those around him are experienced and aware of the risks, and properly trained to handle such risks of caring for him.

Circles' veterinarians will be the ones to tell us if and when he needs to be euthanized.  And if that time comes, we are prepared to relieve him of his suffering because that is the compassionate and humane thing to do.

We have stated numerous times that we do not adopt out dangerous horses, nor do we adopt out ones that our medical teams have not given the full greenlight on.

I've attached real evidence backing up everything I've written here.

As always Colby's Crew will always stand up and fight for the best interest of the horse.  We believe in the right thing to do.

*See id.* at ¶ 47, Ex. A.

Attached to the Post were pictures of documents, including a filing from the Virginia case and communications with Plaintiff.

The Post gained several comments, many of which mentioned Plaintiff by name.  *Id.* at ¶ 132.  Some of the comments made statements such as "this woman sounds like she has a little bit of dementia going on and may need help herself," *id.* at ¶ 133, Ex. Q, "[t]his disturbed person has now taken time and resources from CCR for no gain," *id.* at ¶ 134, Ex. R, "[p]otential adopter sounds unstable," *id.* at ¶ 135, Ex. S, "this woman is just lying right and left she's got an agenda or she's just out of her mind," *id.* at ¶ 136, Ex. T, "[c]uckoo cuckoo," *id.* at ¶ 137, Ex. U, and "dealing with delusional people," *id.* at ¶ 138, Ex. U.

### III.   Legal Standard

Motions to dismiss are governed by Federal Rule of Civil Procedure 12(b)(6).  If a plaintiff fails to state a claim upon which relief can be granted, the court may dismiss the action.  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  The Third Circuit has set forth a three-step analysis for Courts to apply in analyzing a motion to dismiss:  (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

### IV.   False Light Invasion of Privacy

The first cause of action Plaintiff asserts against Defendants is false light invasion of privacy.  Specifically, Plaintiff alleges that CCR, Smith, and Fuller published the Post "to a significant number of people" that "clearly identified Plaintiff" and which "made false statements . . . that, among other things, Plaintiff had never owned a horse, was incapable of managing a horse, could not adopt the horse because she did not complete an application[,] and that Plaintiff did not provide an appropriate plan to care for" the horse.  Compl. at ¶¶ 163-65.  Plaintiff alleges that they "knowingly published such false statements with malice" and that the post "was highly offensive to the reasonable person."  *Id.* at ¶¶ 166-67.

9

To state a claim for false light invasion of privacy, a plaintiff must show that the defendant published material that "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988) (en banc)).

### a. Materially False or Misleading Statements

Defendants make two broad arguments as to why Plaintiff has not pled that the statements in the Post were materially false or misleading.  First, they argue that the claims in the Post were true, and second, they contend that many of the assertions in the Post were statements of opinion, which are not actionable.

Defendants first argue that Plaintiff's false light claim must fail because there were no materially false or misleading statements in the Post, pointing to three discrete statements in the Post that Plaintiff alleges are false or misleading, but which Defendants believe are true:  (1) the statement that Plaintiff was informed that Circles would need to be cleared by veterinarians before the adoption process; (2) the statement that Plaintiff lacked the experience to handle Circles; and (3) the assertion in the Post that Circles' medical plan changed when he was reevaluated in June 2024.  Mot. at 12.  Plaintiff opposes Defendants' characterization of her Complaint as referring only to those three discrete statements as false or misleading, and instead contends that the Post as a whole, in concert with its attachments, was false and misleading.  Opp. at 7.

As to their argument that many of the statements in the Post were statements of opinion, and therefore not actionable, Plaintiff responds that that argument is contradicted by Defendants' assertion in the Post that their readers "deserve the true transparent truth, not fairytales," that CCR "is committed to transparency," and that attached to the Post was "real evidence backing up everything." Opp. at 11.  Further, Plaintiff says, even if they are opinions, those statements imply

false facts, which is actionable under Pennsylvania false light law. *Id.* Specifically, Plaintiff argues that the selected facts Defendants stated in the post, along with any statements of opinion, implied and caused readers to believe that Plaintiff was delusional or mentally unstable. *Id.* at 13.

Without going into depth as to which of each assertion made in the Post is a statement of fact or opinion, I find that Plaintiff has pled at a minimum that some of the statements were false, or at least misleading, and that others were opinions that could have implied false underlying facts. For example, the Post stated that Plaintiff "had never owned a horse before," which is directly contrary to Plaintiff's allegation that she purchased a horse in April 2024 and told Defendant Fuller about it. *See* Compl. at ¶¶ 62, 65. As another example, the statement in the Post that CCR followers "deserve the true transparent truth, not fairytales," although an opinion, might imply the underlying fact that Plaintiff was not telling the truth in either her communications with CCR, its followers, or her complaint filed in the Virginia case. Although many of the statements in the Post do not appear to be false or misleading upon review of the allegations in the Complaint, I find that Plaintiff has pled enough to satisfy this element of a claim for false light invasion of privacy.

### b.  Highly Offensive to the Reasonable Person

Plaintiff's case runs into issues at the determination of whether any of the statements in the Post were highly offensive to the reasonable person. It is well settled law in Pennsylvania that false light invasion of privacy only exists when "the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity. . . . It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy." *Curran v. Children's Serv. Ctr. of Wyoming Cnty., Inc.*, 578 A.2d 8, 12-13 (Pa. Super. 1990) (quoting Restatement (Second) of Torts § 652E cmt. c)). "Ultimately, whether the communication is

capable of bearing a particular meaning which is highly offensive to a reasonable person is a question for the Court." *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 462 (E.D. Pa. 2021) (quoting *Savely v. MTV Music Television*, No. 11-cv-1021, 2011 WL 2923691, at *5 (D.N.J. July 18, 2011)).

I agree with Defendants that Plaintiff has not stated a claim that the contents of the Post were highly offensive to a reasonable person. Plaintiff seems to rely on the fact that some of the comments on the Post indicate that the Post implied Plaintiff was delusional or otherwise unstable as the basis for her claim that the Post was highly offensive. But it cannot be said that the Post—which indeed does not comment on Plaintiff's mental acuity—would cause a reasonable reader to draw such conclusions.

Even if I were to find that the Post implied undisclosed facts about Plaintiff's mental state, such statements are not actionable. Defendants point to *Richette v. Philadelphia Mag.*, No. 802, 1996 WL 756954 (Pa. Com. Pl. May 28, 1996), which I find persuasive in making this determination. In *Richette*, a judge sued Philadelphia Magazine for its publication of an article containing interviews with individuals who had attended some of her trials. The Magazine published statements from the individuals about the judge, including that the judge was "an emotional wreck" and "always in a world of confusion," that she "was throwing a minor hissy fit," and calling her "a horse's ass." *Id.* at *1-2. In deciding whether the plaintiff had stated a claim for false light invasion of privacy, the court held that the comments were "unflattering and annoying" but would not "cause a reasonable person in [her] position to experience intense mental suffering, shame or humiliation." *Id.* at *2. Similarly, here, to the extent the Post implies anything about Plaintiff's mental state—which I do not think it does—any such commentary would be categorized as "unflattering and annoying," which does not rise to the requisite level of offensiveness required for a false light invasion of privacy claim. *See Sarkisian v. Rooke*, No.

06-cv-00170, 2007 WL 9811040, at *5 (E.D. Pa. Mar. 23, 2007) ("[T]he Court has found cases in which false light actions lie because defendants have made insinuations that reflect badly on the plaintiffs' character to an exceptional degree."). For that reason, I find that Plaintiff's false light invasion of privacy claim must fail. I need not reach the issue of whether Defendants made the Post with knowledge of or reckless disregard to the falsity of any statements within it.

## V.    Civil Conspiracy

Plaintiff asserts a claim for civil conspiracy as against CCR and Seltzer, who has been dismissed from this case. A civil conspiracy claim requires "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (internal quotations omitted). Because Seltzer is no longer a Defendant, this cause of action is now asserted solely against CCR, defeating the requirement that a civil conspiracy claim be brought against two or more individuals. Count II is thus dismissed.

## VI.    Motion to Strike

Defendants finally ask the Court to strike paragraphs 117 through 126 as immaterial, scandalous, and impertinent. Mot. at 24-26. Federal Rule of Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Because I find that Plaintiff has not stated a claim upon which relief can be granted and dismiss this case, the Motion to Strike is now moot.

## VII.    Attorneys' Fees and Litigation Expenses

Defendants finally seek reasonable attorneys' fees and litigation expenses pursuant to Pennsylvania's Anti-Strategic Lawsuit Against Public Participation ("Anti-SLAPP") statute, 42 Pa. Cons. Stat. Ann. § 8340.11, *et seq.* Pennsylvania's General Assembly enacted the Anti-SLAPP

13

statute to address lawsuits "brought primarily to chill the valid exercise of protected public expression" by "grant[ing] immunity to those groups or parties exercising the rights to protected public expression" and "award[ing] attorney fees to parties that are forced to defend against meritless claims arising from the exercise of the rights to protected public expression." *Id.* at § 8340.12.  The statute defines "protected public expression" as "(1) communication in a legislative, executive, judicial or administrative proceeding; (2) communication on an issue under consideration or review in a legislative, executive, judicial or administrative proceeding; or (3) exercise, on a matter of public concern, of the rights of freedom of speech or of the press, the right to assemble or petition or the right of association." *Id.* at § 8340.13.  It provides that "[a] person is immune from civil liability for a cause of action based on protected public expression if . . . [t]he party asserting the cause of action based on protected public expression fails to: (i) establish a prima facie case as to each essential element of the cause of action; or (ii) state a cause of action upon which relief can be granted," or if "[t]here is no genuine issue as to any material fact, and the person against whom the cause of action based on protected public expression has been asserted is entitled to judgment as a matter of law in whole or in part." *Id.* at § 8340.15.  Finally, as relevant here, it provides for an award of attorney fees, court costs, and litigation expenses to a party who is found to be immune under Section 8340.15. *See id.* at § 8340.18(a).

Defendants contend that they are immune from liability under Section 8340.15 because the Post concerns an "issue under consideration or review" in a judicial proceeding—namely, the Virginia lawsuit.  Thus, Defendants say, they are entitled to attorneys' fees under Section 8340.18.

The Third Circuit has not yet ruled on whether Pennsylvania's Anti-SLAPP statute applies in federal court, but there have been a handful of federal district court cases addressing the issue. In both *Jakes v. Youngblood*, 782 F. Supp. 3d 210 (W.D. Pa. 2025) and *Salaam v. Trump*, 350 F.R.D. 14 (E.D. Pa. 2025), courts held that Section 8340.15, the immunity provision of the Anti-

14

SLAPP law, does not apply in federal court because it conflicts with federal procedural law. *See Jakes*, 782 F. Supp. 3d at 218 ("The Court holds that there is a direct conflict between § 8340.15 and Rules 12(b)(6) and 56. For the category of cases that it covers, § 8340.15 essentially supplants the Rule 12(b)(6) motion to dismiss standard with the Rule 56 summary judgment standard."); *Salaam*, 350 F.R.D. at 20 ("Rules 12 and 56 govern how—and at what stage—federal courts may dispose of lawsuits before trial, and § 8340.15 answers that same question. As such, it cannot apply in federal court."). I agree, and similarly hold that Section 8340.15 does not apply in federal court—which is to say that, because Section 8340.15 creates a mechanism to resolve a case pre-trial that conflicts with Federal Rule of Civil Procedure 12(b)(6) by effectively "supplant[ing] the Rule 12(b)(6) motion to dismiss standard with the Rule 56 summary judgment standard," *see Jakes*, 782 F. Supp. 3d at 218, the *Erie* doctrine prevents its applicability in federal court.

Notably, however, *Jakes* and *Salaam* did not rule on whether Section 8340.18, the fee-shifting provision, applies in federal court. *See Jakes*, 782 F. Supp. 3d at 220 ("The Court holds that § 8340.18's award of fees is inapplicable at this stage of litigation, and at this time, it will not reach the issue of whether § 8340.18 is applicable in federal court."); *Salaam*, 350 F.R.D. at 21 n.8 ("As there is not a Motion for Attorney's Fees . . . before the Court, the question of whether [Section 8340.18] appl[ies] in a federal court—and whether [it] can ever be triggered without an application of § 8340.15—is not addressed.").

Indeed, just a few days ago, the Honorable John F. Murphy of the United States District Court for the Eastern District of Pennsylvania held that the determination of whether a defendant was entitled to attorney's fees pursuant to Pennsylvania's Anti-SLAPP statute would be affected by "the presence or absence of a conflict between the anti-SLAPP provisions and federal law." *McCaffery v. New York Univ. Sch. of Law*, No. 25-cv-2429, 2026 WL 746606, at *12 (E.D. Pa. Mar. 16, 2026). And in the United States District Court for the Middle District of Pennsylvania,

the Honorable Julia K. Munley recently acknowledged the lack of settled law on the issue and declined to make an immunity ruling, allowing the defendant to either move for a determination of immunity and a fee award or to bring a separate action seeking the same in Pennsylvania state court pursuant to Section 8320.1. *See Vespico v. Kass-Gerji*, No. 25-cv-512, 2026 WL 736463, at *11-13 (M.D. Pa. Mar. 16, 2025).

Because I agree with my colleagues that Section 8340.15 creates a procedural mechanism that does not apply in federal court, Section 8340.18 by necessity is not applicable either. Indeed, Section 8340.18 is predicated upon an immunity finding pursuant to Section 8340.15. *See* 42 Pa. Cons. Stat. Ann. § 8340.18 ("*If the party is immune under section 8340.15 (relating to grant of immunity), the court shall award the party attorney fees, court costs and expenses of litigation jointly and severally against each adverse party that asserted the cause of action.*") (emphasis added). Other federal circuits have held that when an anti-SLAPP statute provides a procedural mechanism for dismissal that does not apply in federal court, fee provisions that are predicated on that procedural mechanism similarly do not apply in federal court. *See Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1337 n.5 (D.C. Cir. 2015) ("After granting or denying a special motion to dismiss under the Anti-SLAPP Act, a court may grant attorney's fees and costs to the prevailing party. . . . The Act does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12(b)(6). Therefore, although we conclude that the case should be dismissed under Rule 12(b)(6), attorney's fees under the Anti-SLAPP Act are not available to the defendants in this case."); *Klocke v. Watson*, 936 F.3d 240, 247 n.6 (5th Cir. 2019), *as revised* (Aug. 29, 2019) ("Suffice to say that because [Texas's Anti-SLAPP law] does not apply in federal court, the district court erred by awarding fees and sanctions pursuant to it."); *La Liberte v. Reid*, 966 F.3d 79, 88-89 (2d Cir. 2020) ("California's anti-SLAPP statute likewise awards attorneys' fees *only* to 'a prevailing defendant on a special motion to strike.' . . .

So [Defendant] cannot recover attorneys' fees based on the district court's Rule 12(b)(6) dismissal.") (emphasis in original).

Similar to the statutes at issue in *Abbas*, *Klocke*, and *La Liberte*, Pennsylvania's Anti-SLAPP statute creates a procedural mechanism for resolving a case which is separate and apart from—and conflicts with—Federal Rules of Civil Procedure 12(b)(6) and 56, and it is therefore not applicable in federal court. As such, the fee-shifting provision of the Anti-SLAPP statute that requires the application of that procedural mechanism prior to an award of attorneys' fees is not applicable in federal court either.

## VIII.    Conclusion

For the foregoing reasons, I grant Defendants' Motion to Dismiss in part. An appropriate Order follows.

17